Filed 10/29/13  P. v. Silberman CA6
**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE, | H038722 |
| Plaintiff and Respondent, | (Santa Clara County Super. Ct. No. C1110721) |
| v. | |
| CARY JAY SILBERMAN, | |
| Defendant and Appellant. | |

After a jury trial, defendant Cary Jay Silberman was convicted of 19 counts of practicing medicine without a license in violation of Business and Professions Code section 2052, subdivision (a).  He was ordered to serve two years, eight months in state prison and two years on mandatory supervision.  (See Pen. Code, § 1170, subd. (h)(5)(B)(i).[1])  He was also ordered to pay victim restitution and various fees and fines, including a probation supervision fee of $110 per month and a $259.50 criminal justice administration fee.

Defendant contends 10 of his convictions must be reversed because the trial court precluded him from calling a particular witness at trial.  Defendant also contends that the monthly supervision fee of $110 is unauthorized and must be stricken and that, even assuming such a fee is statutorily authorized, the trial court failed to follow the proper

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

procedures for imposing the fee and there is insufficient evidence to support a finding of his ability to pay the fee. He also contends trial counsel was ineffective for failing to object to the imposition of the $259.50 criminal justice administration fee.

For reasons that we will explain, we conclude the monthly supervision fee was unauthorized. We will strike that fee and affirm the judgment as so modified.

## BACKGROUND

Defendant owned a business called Shiny Toes, with facilities in San Jose, San Ramon, and San Francisco. Each of the victims in this case went to Shiny Toes to get laser treatment for toenail fungus. At the San Jose facility, defendant usually performed the laser treatments. At the San Ramon and San Francisco facilities, the laser treatments were performed by women that defendant had hired.

Defendant was charged with 20 counts of practicing medicine without a license (Bus. & Prof. Code, § 2052, subd. (a)[2]) and one count of willfully causing a child to suffer unjustifiable physical pain or mental suffering (§ 273a, subd. (b)). At trial, the prosecutor argued there were four ways in which the jury could find defendant practiced medicine without a license, as to the victims he personally treated: (1) by diagnosing a medical condition; (2) by treating a medical condition; (3) by advertising himself as a doctor; and (4) by holding himself out as a doctor. The prosecutor argued that defendant

---

[2] Business and Professions Code section 2052, subdivision (a) provides: "[A]ny person who practices or attempts to practice, or who advertises or holds himself or herself out as practicing, any system or mode of treating the sick or afflicted in this state, or who diagnoses, treats, operates for, or prescribes for any ailment, blemish, deformity, disease, disfigurement, disorder, injury, or other physical or mental condition of any person, without having at the time of so doing a valid, unrevoked, or unsuspended certificate as provided in this chapter or without being authorized to perform the act pursuant to a certificate obtained in accordance with some other provision of law is guilty of a public offense, punishable by a fine not exceeding ten thousand dollars ($10,000), by imprisonment pursuant to subdivision (h) of Section 1170 of the Penal Code, by imprisonment in a county jail not exceeding one year, or by both the fine and either imprisonment."

2

could be found guilty of the counts involving victims he did not personally treat either because he advertised himself as a doctor or because he aided and abetted the diagnosis and/or treatment of those victims.

### A.    *Complaint and Initial Investigation*

In January of 2011, the Medical Board of California received a complaint alleging that defendant was performing laser treatments for toenail fungus without a medical license.  An investigator determined that defendant's name was not listed in the Medical Board database, the Board of Podiatry database, or the Osteopath database.  Defendant was also not a licensed naturopathic doctor.

Attached to the complaint was a newspaper advertisement for Shiny Toes.  The investigator went onto the Internet and looked at the Shiny Toes website, which stated that defendant was the "medical director" of the business.  The Shiny Toes website had a heading entitled "Diagnosis."

The investigator also found YouTube videos featuring defendant and Shiny Toes. One promotional video depicted defendant talking, a diploma or certificate, a close-up shot of toes, and a discussion between defendant and a patient.  The transcript for the video was introduced at trial.  A male voice says, "Do you know there's a new way of eliminating toenail fungus that doesn't involve those pills that could damage your liver? That's right.  It's a new cold laser procedure that's pain free, no side effects, takes about 30 minutes, you walk in and you walk right out.  Shiny Toes now offers this exciting new procedure for about half of what others are charging.  If it does not go away the first time, we offer a follow up procedure at no extra charge.  If you want to be proud of your feet again, call Shiny Toes today or visit our website."  A female voice then says, "Wow that was easy, I didn't feel a thing.  Thank you, doctor."

### B.    *Undercover Investigation*

On April 29, 2011, Medical Board of California Supervising Investigator Victor Sandoval went into the Shiny Toes facility in San Jose wearing a wire.  The facility was

3

located on North Third Street in a three-story Victorian house that formerly housed a bed-and-breakfast. A black banner with white lettering hanging outside the building read "Shiny Toes."

A woman answered the door and had Sandoval fill out paperwork in a waiting room. Sandoval noticed diplomas on the walls and/or a table in the waiting room. Two of them read, " 'Harvard Medical School Department of Continuing Education, certifying Cary Silberman.' "

A patient was in the exam room at the time Sandoval entered, but defendant called Sandoval in after the patient left. Defendant was wearing a white lab coat embroidered with " 'Harvard Medical School.' " Sandoval asked defendant, " 'Did you go to Harvard Medical School?' " Defendant replied, " 'Yes, I did.' " However, he said, he " 'took a different path,' " having studied with someone in India. Sandoval asked if defendant was an M.D. Defendant said no, he was a "homeopathic physician."

Sandoval stated that his girlfriend did not like his toes, and that a podiatrist had warned him that taking medication for toenail fungus would be bad for his liver. Defendant examined Sandoval's feet and told him that he "had a severe case of toenail fungus." Defendant used the term "onychomycosis" to refer to the toenail fungus. Defendant said that if Sandoval did not take care of the fungus, it would attack his immune system and make him susceptible to colds and the flu. Defendant offered to perform the laser treatment for $395 instead of $595. Sandoval left, saying he had to talk to his girlfriend.

### C. *Execution of Search Warrants*

On June 14, 2011, investigators executed a search warrant at the Shiny Toes facility in San Jose. They seized patient records, certificates, business cards with the words " 'Medical Director' " below defendant's name, labels reading " 'Cary Silberman, M.D.,' " a white lab coat embroidered with " 'Harvard Medical School,' " a name badge reading " 'Cary Silberman, M.D., Neurology,' " a name badge reading " 'Harvard

4

Medical School Continuing Education, Cary Jay Silberman, M.D.,' " and several laser devices, including a K. Laser and a Thor Laser.

The patient files each included a form entitled "Agreement for Services" and a form describing post-procedure instructions. Some of the patient files included copies of receipts. None of the files included a Business and Professions Code section 2053.6 disclosure form, which would have informed the patients that defendant did not hold a medical license.[3]

Defendant gave a statement to the investigators. He owned Shiny Toes facilities in San Francisco, San Ramon, Woodland Hills, New York City, and Sacramento. He usually charged $395 for a toenail fungus treatment. He saw five or six patients per day in San Jose. He also treated people for pain management. He advertised the business in newspapers and on the radio, television, and the Internet. He asserted that the employees at the Shiny Toes facilities were all independent contractors.

Investigators served a search warrant at the Shiny Toes facility in San Ramon on June 17, 2011. Two employees were present at the time: Raquel Sapper and Vivian Cesana, who was performing a laser procedure on a patient.

---

[3] Business and Professions Code section 2053.6, subdivision (a) provides that a person who holds himself or herself out as a physician or renders certain medical services shall: "(1) Disclose to the client in a written statement using plain language the following information: [¶] (A) That he or she is not a licensed physician. [¶] (B) That the treatment is alternative or complementary to healing arts services licensed by the state. [¶] (C) That the services to be provided are not licensed by the state. [¶] (D) The nature of the services to be provided. [¶] (E) The theory of treatment upon which the services are based. [¶] (F) His or her educational, training, experience, and other qualifications regarding the services to be provided. [¶] (2) Obtain a written acknowledgment from the client stating that he or she has been provided with the information described in paragraph (1). The client shall be provided with a copy of the written acknowledgement, which shall be maintained by the person providing the service for three years."

5

### D.       Employee Testimony

Raquel Sapper worked as a laser technician at the San Ramon facility. Her daughter, Vivian Cesana, worked with her. Neither Sapper nor Cesana was a licensed nurse or doctor, although Cesana was a licensed esthetician. Defendant had trained them on the use of the laser, and they had taken a training class through Thor Laser after they had been working at the facility.

Sodabeh Kashi worked as a receptionist at the San Jose facility. She greeted clients, had them fill out paperwork, answered questions, received payments, answered phones, and did the scheduling for all of the facilities. Kashi became involved in treating clients after a few months of working at Shiny Toes. She took a one-day training class but never took the exam and thus never became certified. Nevertheless, she had business cards printed with her name and the phrase " 'Certified Laser Technician.' "

Sapper, Cesana, and Kashi all testified they had never seen a Business and Professions Code section 2053.6 form. They each denied ever referring to defendant as "Doctor" or telling anyone that he was a doctor. Kashi testified she had never heard defendant introduce himself to anyone as a doctor.

### E.       Victim Testimony

At trial, 19 of the 20 victims (including Investigator Sandoval) testified. During trial, the trial court granted the prosecutor's motion to dismiss count 4, which pertained to a victim who was unavailable.

All of the victims testified they did not receive a Business and Professions Code section 2053.6 disclosure form. Most of the victims testified that they saw little to no improvement in their toenail fungus after the laser procedures.

Most of the victims saw an advertisement for Shiny Toes in a newspaper. At trial, many of the witnesses agreed that the advertisements they saw were similar to Exhibit 1, which stated, "The Fastest Way to Get Rid of Toenail Fungus Only $500 (Reg. $1,200)." The advertisement further specified, "Cold Laser Procedure  [¶] Free Consultation ● 30

6

Minute Procedure [¶] No Pain, No Side Effects ● Free Follow Up." It listed the street address, phone number, and website address for the Shiny Toes facility in San Jose.

### 1. Raymond Afanador, Jr.

Raymond Afanador, Jr. saw a Shiny Toes advertisement in the newspaper. He called the number on the ad because both he and his then three-year-old son had toenail fungus. Defendant answered the phone. Afanador told defendant that he had taken his son to the hospital, where he had been given oral medication. Defendant told Afanador to "dump that immediately because it was bad for his [son's] liver." Afanador followed defendant's instructions and brought his son in to see defendant three or four weeks later.

On October 11, 2010, Afanador and his son went to the Shiny Toes facility in San Jose. Afanador "felt like" he was in a doctor's office. Defendant looked at Afanador's and Afanador's son's toes and said, " 'Yes, that definitely is fungus, and we can treat it.' " During the appointment, defendant wore a white lab coat. He introduced himself as "Cary Silberman," not "Doctor." Defendant's business card, stating that he was the " 'medical director' " of Shiny Toes, contributed to Afanador's belief that defendant was a doctor.

During a subsequent visit, defendant performed the laser treatment on Afanador's son's toes. When his son complained that the laser was too hot, defendant lowered the setting and applied numbing cream.[4]

Afanador brought his son for several additional treatments, paying $500 plus the cost of some products he purchased from defendant. During one of the follow-up visits, Afanador told defendant that his wife was having some uterus problems. Defendant said that Afanador's wife could come in for a consultation.

---

[4] Afanador's son was the named victim of count 21, which alleged defendant willfully caused a child to suffer unjustifiable physical pain or mental suffering (§ 273a, subd. (b)). The jury found defendant not guilty of that charge.

7

### 2.     Frank J. Alix

Frank J. Alix heard about Shiny Toes on television, where he saw an interview of defendant.  In the interview, defendant said he could treat toenail fungus with a laser.  Alix, who had previously been told by a doctor that he had toenail fungus, made an appointment at the San Jose facility.  He went there on April 15, 2011.  He met with the receptionist and filled out forms.  Defendant came out and took him to the exam room, which had a "table bed" like a doctor's table.  Defendant, who referred to himself as "Doctor," wore a white smock "like a doctor."

Defendant examined Alix's feet and said, " 'I can save your nails.' "  He showed Alix the laser machine and gave him a treatment.  He said Alix would need at least four sessions.  When Alix came back for his second treatment, the receptionist said, " 'The doctor's not here.  He's out of town.  And I will do the procedure.' "  Alix agreed, but he did not return for further treatments.  He paid $245 for the first treatment and $149 for the second treatment.

### 3.     Martin Grealish

Martin Grealish saw a newspaper advertisement for Shiny Toes.  He called and made an appointment at the San Francisco facility in the spring of 2011.  When he arrived, he was met by a female.  He filled out some forms and sat in a chair.  The female examined his feet and said, " 'You have toenail fungus for sure on your big toe, and probably on a couple [of] others.' "  She provided a laser treatment.

Grealish, who paid about $500, received laser treatments at Shiny Toes three times.  Different "girls" treated him each time; they were "obviously" not doctors.  He saw no improvement in his toenail fungus.

### 4.     Baldemar Ortiz

Baldemar Ortiz saw a Shiny Toes advertisement in the newspaper, then looked at the Shiny Toes website and online videos.  Believing it was "a professional medical

facility" and that defendant, who he saw in the video, was a doctor, Ortiz made an appointment.

Ortiz went to the San Ramon facility on February 21, 2011. It did not look like a medical facility, but rather like an office space. A woman met him there. He sat in a regular chair while she performed the laser procedure on him. He knew the woman was not a doctor. After the appointment, the woman gave him a piece of paper that recommended he apply tea tree oil to his toes. At a follow-up appointment on February 28, 2011, Cesana performed the laser procedure on him.

### 5.  Lynn New

Lynn New saw a Shiny Toes advertisement in the newspaper, then decided to drop in at the San Jose facility in May of 2011. She saw "diplomas" on the walls. She returned for a laser treatment about a week later. The female receptionist performed the laser treatment, but New believed the facility was under the supervision of a doctor.

New returned for a second treatment about one week after the first treatment. A different woman performed the laser treatment. New paid $425 and saw no improvement in her condition. She never met defendant.

### 6.  Dr. Deanna Aronoff

In March of 2011, Dr. Deanna Aronoff, a pediatric dentist, saw an infomercial featuring defendant, who was talking about laser treatments offered by Shiny Toes. She subsequently saw a Shiny Toes coupon in the newspaper. Believing she might have toenail fungus, she called and made an appointment at the San Jose facility.

Dr. Aronoff was greeted by a receptionist. She waited in the waiting room, where she saw defendant's Harvard Medical School Continuing Education certificates. She assumed that he had taken continuing education to keep up his medical license.

Defendant, wearing a white lab coat, introduced himself as " 'Cary,' " but Dr. Aronoff felt that was the usual way that one doctor would introduce himself or herself to another doctor. The receptionist had referred to defendant as " 'Doctor.' "

9

In the exam room, defendant looked at Dr. Aronoff's feet, reviewed the forms she had filled out, said she had onychomycosis, and talked about the laser treatment. She received the treatment, purchased some liquid spray from Shiny Toes, and made follow-up appointments. She ultimately received six treatments. Defendant performed the first five treatments. The receptionist performed the sixth treatment, but she used a florescent light instead of a laser. Dr. Aronoff did not see much improvement after the treatments.

### 7.     Janet Schreiber

In May of 2011, Janet Schreiber saw advertisements for Shiny Toes in the newspaper and made an appointment at the San Ramon facility. During her appointment, Cesana looked at her feet and toes and said, " 'Yes, you do have toenail fungus.' " Cesana treated her toes with a laser. Schreiber never met defendant, and she did not believe Cesana was a doctor. She paid $395 for the laser treatment.

### 8.     Gail Greenberg

In August of 2010, Gail Greenberg saw a Shiny Toes advertisement in the newspaper. She believed she had toenail fungus on one toe. She made an appointment at the San Jose facility. Defendant did a cursory exam of her feet, and the receptionist provided the laser treatment to Greenberg. Either defendant or the receptionist told Greenberg that she had fungus on all of her toes.

Greenberg was treated at Shiny Toes four times. Defendant performed at least one of the laser treatments. Defendant was always on site, wearing a white lab coat. At Greenberg's final visit, defendant used a UV machine instead of the laser.

Greenberg never believed defendant was a doctor. She asked him "how it was that he could use a laser." Defendant said "that you didn't need a license. You just needed to be trained."

### 9.     Edward Pacheco

Edward Pacheco saw a Shiny Toes advertisement in the newspaper. He made an appointment, then went to the San Jose facility on June 1, 2010. After meeting with a

10

receptionist and filling out paperwork, he met with defendant, who was wearing a long white jacket. Defendant looked at Pacheco's feet, confirmed that he had toenail fungus, and said that "he had seen worse, and that he thought he could help [him]." The receptionist then performed the laser procedure. She also performed the laser procedure when Pacheco returned to Shiny Toes for a follow-up visit in November of 2010.

### 10. Richard Rodriguez

Richard Rodriguez saw a Shiny Toes advertisement in the newspaper, then looked up Shiny Toes on the Internet. He made an appointment at the San Francisco facility in January or February of 2011. He met with two women there. The women looked at his toes, confirmed he had toenail fungus, and performed the laser procedure on him. The women told him that three treatments would work and that he should also use tea tree oil and an anti-fungus cream.

At Rodriguez's second visit, a different woman treated him. Rodriguez told her that he had been having pain in his left knee. The woman offered to do a laser treatment on his knee, saying it seemed to work on her mother. Rodriguez agreed and had the treatment on his knee.

Rodriguez returned for his third appointment, but at that point the facility was closed. Following the laser treatment, he had only a slight improvement in his toenail fungus, and his knee pain was a little worse. Rodriguez never met defendant, and he knew the women who had treated him were not doctors. The women had referred to themselves as technicians.

### 11. Susan Demartini

In January of 2011, Susan Demartini's friend saw a Shiny Toes advertisement in the newspaper. Demartini went to the San Francisco facility on January 31, 2011. She was treated by Nicole Kelly, who looked at her feet, said she had toenail fungus, and applied the laser. Kelly instructed her to apply vinegar and tea tree oil following the treatment.

11

Demartini returned for two more appointments, which were with different women. Each of the women told her that a doctor was "in charge of it." She paid $495 for the treatments, but her condition did not change.

### 12. Jeri Fox

Jeri Fox saw a Shiny Toes advertisement in the newspaper. She met defendant at the San Jose facility on April 5, 2011. She called defendant " 'Doctor Silberman,' " but he corrected her. He said he had gone to Harvard but had chosen homeopathy. Defendant looked at Fox's toes and said that she had toenail fungus. He applied the laser treatment to all of her toes, even though she did not have fungus on all of them. Fox purchased fungicide and a spray from defendant to use following the treatment, paying a total of $555.

### 13. Darren Englund

Darren Englund saw a Shiny Toes advertisement in the newspaper. He made an appointment and visited the San Ramon facility on June 1, 2011. A woman performed the laser procedure and applied tea tree oil to his toes. He paid $395, and he did not return for any follow-up visits. He observed no improvement in his toenail fungus.

### 14. John Henderson

John Henderson saw a Shiny Toes advertisement in the newspaper. He had previously been diagnosed with toenail fungus by a podiatrist, who gave him medication but said it might cause liver damage. He made an appointment and visited the San Ramon facility. Sapper provided the treatment. She looked at his toes, said he had toenail fungus, and applied the laser as well as tea tree oil. The laser did not emit light and Henderson was not sure it was actually activated.

Henderson called to make a follow-up appointment in February or March of 2011. He was told that he had to go to the San Jose facility, but when he arrived there, the search warrant was being executed.

### 15. Irene Bates

Irene Bates saw a Shiny Toes advertisement on television, then went online to look at the website. She went to the San Jose facility to make an appointment. A receptionist told her that "the doctor" would answer her questions. Her first appointment was on February 18, 2011. This was a "consultation with the doctor." Defendant, who wore the white lab coat, checked her feet, then said she had toenail fungus and that he could treat it. Bates had follow-up appointments, during which defendant or another person performed laser treatments. She made two payments of $295 for the treatments.

### 16. Sarah Green

Sarah Green saw a Shiny Toes advertisement in the newspaper, then made an appointment at the San Jose facility. She went there on January 26, 2011. Defendant confirmed she had toenail fungus, then performed the laser treatment. When Green returned for a follow-up visit a couple months later, the receptionist performed the treatment, saying she was qualified. Green purchased creams from defendant. Her fungus improved a bit but was not gone.

### 17. Edmund Hee

Edmund Hee saw a Shiny Toes advertisement in the newspaper, then made an appointment at the San Ramon facility. At his appointment on February 2, 2011, Vivian Cesana examined his toes. Hee had been concerned about his big toe, but Cesana told him it looked like all of his toes were infected. She performed the laser treatment. Hee made a second appointment, but when he arrived there was an investigator at the office.

### 18. Richard Spencer

Richard Spencer saw a Shiny Toes advertisement in the newspaper, then made an appointment at the San Ramon facility. At his appointment on May 24, 2011, two women were present. One of them took his money ($395) and paperwork. The other woman examined his toes, said he had a fungus, and told him they could help him get rid

of it.  She applied the laser.  Spencer used tea tree oil after the treatment, and he believed the oil helped his toenail fungus more than the laser.

### F.    *Defendant's Testimony*

Defendant took a 12-week online homeopathy course in 2006.  The course was provided by an organization that was run by a doctor in India.  According to defendant, homeopathy is an "alternative method for treating," based on the concept that one should treat "like symptoms with like remedies."  His homeopathy certificate was displayed in the San Jose facility, in the room where the clients paid for services.

When defendant started the Shiny Toes business, he did some research into the Medical Board regulations.  The board's website indicated that only M.D.'s and R.N.'s could use lasers for spider vein removal, tattoo removal, and hair removal.  He assumed that while such procedures were invasive, the same restriction did not apply to the use of lasers for toenail fungus.

Defendant had taken training courses in the use of the "cold laser" devices, and he was certified to use them.  He initially intended to use the lasers for pain management, but then decided to use them to treat toenail fungus.

Defendant had attended continuing education classes at Harvard Medical School.  According to defendant, "pretty much anybody can attend."  He did not tell Harvard that he was an M.D.; he said he was a homeopath.  When he signed up online, he selected the prefix " 'Mr.' " rather than " 'Dr.' "  He answered "No" to the question of whether he was board-certified.  He answered " 'Homeopathy' " to the question of whether he had a specialty degree.  He answered " '[o]ther U.S. medical school' " to the question of what professional or medical school he had attended, since that was the only choice that would allow him to continue the application.  For his principal specialty, he selected " '[n]eurology,' " because he had to choose something from the drop-down list.  He did not fill in the year of graduation from medical school, and he listed his profession as " '[o]ther.' "  Harvard initially charged him the fee that it charged doctors, but it reduced

14

his fee after he sent an email explaining that he was only an "allied health care professional."

Defendant purchased the " 'Harvard Medical School' " lab coat at a gift shop when he attended one of the continuing education courses. He wore it "once in a while." He wore a plain white lab coat other times, including when he was filming the promotional video.

At one of the Harvard Medical School courses, defendant received lanyards with his name followed by " 'M.D.' " He never wore the lanyards and kept them in a bedroom drawer.

Defendant gave out business cards to his clients "all the time" and made them available in a display rack. The business cards for his Beverly Hills clinic did contain the term " 'Medical Director,' " but that was to avoid confusion since a chiropractor worked at the same office.

If clients ever referred to him as "doctor," defendant would say, "[P]lease, my name is Cary. I'm not a doctor. Please call me Cary. I'm a homeopath." However, he admitted that he told Investigator Sandoval, during the undercover investigation, that he was a "homeopathic physician."

Defendant chose the name "Shiny Toes" for his business in the belief that it would convey that he was not running a medical office. In fact, many people thought it was a nail salon. However, he had signed a rental agreement that referred to him as " 'Dr. Silberman' " and " 'Dr. Cary Silberman.' "

Defendant believed that toenail fungus could be self-diagnosed and that all of his clients had self-diagnosed their toenail fungus or had been diagnosed by a doctor. He never performed any procedure to confirm the presence of toenail fungus. He acknowledged that the Shiny Toes website had a " 'Diagnosis' " section, which stated that " 'certified laser specialists' " would " 'distinguish if you have nail fungus.' " The

15

website also had a " 'Facts and Questions' " section, which contained the question " 'Are you doctors?' " and the response " 'We are homeopathic physicians.' "

Defendant testified that his ex-wife, Cathy Kelly, did all of the marketing for Shiny Toes. However, she was out of the country when he had the promotional video produced in October 2010. When Kelly returned from being out of the country, she watched the video and told defendant that he needed to change the end of the video, where the female says, " 'Thank you, Doctor.' " In January of 2011, defendant contacted the videographer, Kelly Priest, and asked him to cut out the end of the video. Priest made the edits and gave defendant the edited version.

Defendant acknowledged that he had previously been convicted of practicing law without a license. He had obtained a J.D. and passed the bar in 1991, but he had resigned in 1997 with misconduct charges pending. He had later assisted someone with preparing a bankruptcy.

### G.    Expert Testimony

Dr. Vincent Yap, M.D. worked part-time as a district medical consultant for the Medical Board. He testified that a laser emits radiation and has several medical uses, including cutting, heating, and burning tissue. The term " 'cold laser' " is a misnomer because all lasers produce some heat; a better term might be " 'low-level laser.' " "[I]t's a given that a laser will penetrate tissue." Laser machines have been submitted to the FDA for approval for the treatment of toenail fungus, but there has not yet been any approval.

According to Dr. Yap, the Medical Board's policy is that only licensed doctors – or licensed personnel under the supervision of a doctor – can use lasers, even though its website only lists three conditions for which laser use is restricted.

Dr. Yap also testified that the diagnosis of toenail fungus requires medical expertise, particularly since it can be associated with another infection. A diagnosis includes taking the patient's medical history and performing a physical examination.

16

## H.    Trial

The jury convicted defendant of practicing medicine without a license (Bus. & Prof. Code, § 2052, subd. (a)) as to all 19 victims who testified at trial, but it found him not guilty of willfully causing a child to suffer unjustifiable physical pain or mental suffering (§ 273a, subd. (b)).  At sentencing, the trial court ordered defendant to serve two years, eight months in state prison, followed by two years on mandatory supervision. (See § 1170, subd. (h)(5)(B)(i).)  He was ordered to pay victim restitution as well as various fees and fines, including a probation supervision fee of $110 per month and a $259.50 criminal justice administration fee.

## DISCUSSION

## A.    *Exclusion of Defense Witness*

Defendant claims that the trial court abused its discretion by excluding relevant evidence (see Evid. Code, §§ 210, 351) and violated his rights under the Sixth Amendment and the Fourteenth Amendment to a fair trial and due process when it precluded him from calling Jerry Briesach as a witness on his behalf.

### 1.    **Proceedings Below**

During trial, towards the end of the prosecution's case, the prosecutor informed the court that defendant was seeking to call a witness who would testify he was told that defendant "was not a licensed doctor but a homeopathic doctor."  The prosecutor indicated he was objecting to the witness's proposed testimony as irrelevant.

Defendant identified the witness as Briesach.  He argued that Briesach "would be a relevant witness."  Defendant made the following offer of proof:  "[Briesach] would say that he did see Mr. Silberman for a laser procedure, and that Mr. Silberman was forthcoming about not being a medical professional . . . ."  Defendant specified that the incident had occurred within the last two years.  Defendant argued that Briesach's testimony would be relevant to two of the theories of guilt:  (1) that defendant was

17

holding himself out as a doctor, and (2) that defendant was advertising himself as a doctor. Defendant indicated the issue implicated his Sixth Amendment and Fourteenth Amendment rights to a fair trial.

The trial court deferred its ruling until the following day.

The next day, defendant made a record following a discussion that occurred "off the record," during which the trial court had excluded Briesach's testimony. Defendant asked that a defense investigator's report be marked as a court exhibit. The trial court agreed.

The investigator's report reflects that Briesach met defendant "through a mutual friend at a dinner party." Defendant had not presented himself "as a medical professional." Rather, Briesach knew defendant "as a lawyer." Briesach had chronic back pain. Defendant told Briesach "that he had a 'pretty high tech' laser," which treated toenail fungus but could also provide "possible pain relief." Briesach went for laser treatments twice and "felt that the laser helped ease his pain." Defendant had not charged Briesach for the procedure; he had "provided the service more as a friend."

The trial court explained its ruling on the record. It found that Briesach's testimony was "not relevant," noting that Briesach had received laser treatment for pain management, not toenail fungus. The trial court also excluded Briesach's testimony pursuant to Evidence Code section 352, finding that it would be "more confusing to the jury, and so more prejudicial than probative."

### 2.    Analysis

Defendant contends that the trial court erred by excluding Briesach's testimony. He contends the testimony was relevant to the question whether defendant was holding himself out as a doctor – i.e., one of the four theories of guilt – as to the 10 counts involving victims who received laser treatment at the San Jose office.[5]

---

[5] Defendant acknowledges that Briesach's testimony was not relevant to the counts involving treatments at the San Ramon and San Francisco offices, since defendant

18

" ' "Only relevant evidence is admissible (Evid. Code, § 350; [citations]), and, except as otherwise provided by statute, all relevant evidence is admissible (Evid. Code, § 351; see also Cal. Const., art. I, § 28, subd. (d) . . .)." [Citation.] "Relevant evidence is defined in Evidence Code section 210 as evidence 'having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action.' The test of relevance is whether the evidence tends 'logically, naturally, and by reasonable inference' to establish material facts such as identity, intent, or motive. [Citations.]" [Citation.]' " (*People v. Tully* (2012) 54 Cal.4th 952, 1010 (*Tully*).)

" '[T]he trial court has broad discretion to determine the relevance of evidence.' [Citation.]" (*Tully, supra,* 54 Cal.4th at p. 1010.) "On appeal, 'an appellate court applies the abuse of discretion standard of review to any ruling by a trial court on the admissibility of evidence . . . .' " (*People v. Hovarter* (2008) 44 Cal.4th 983, 1007-1008.) A trial court abuses its discretion when its ruling falls outside the bounds of reason. (*People v. Benavides* (2005) 35 Cal.4th 69, 88.)

As noted above, the prosecutor argued there were four ways in which the jury could find defendant practiced medicine without a license, as to the victims he personally treated: (1) by diagnosing a medical condition; (2) by treating a medical condition; (3) by advertising himself as a doctor; and (4) by holding himself out as a doctor.[6] The

did not personally treat those victims and the prosecution did not argue that defendant had held himself out as a doctor to those victims. The same rationale would apply to one of the San Jose victims, Lynn New, who never met defendant.

[6] The jury was instructed that in order to find defendant guilty of violating Business and Professions Code section 2052, it had to find that "[1] the defendant practiced, attempted to practice, advertised or held himself out as practicing any system or mode of treating the sick or afflicted; or, [2] the defendant diagnosed, treated, operated for, or prescribed for any ailment, blemish, deformity, disease, disfigurement, disorder, injury, or other physical or mental condition of any person; and, [3] at the time of doing so, the defendant did not have a valid, unrevoked or unsuspended physician's . . . [license]."

prosecutor argued that defendant could be found guilty of the counts involving victims he did not personally treat either because he advertised himself as a doctor or because he aided and abetted the diagnosis and/or treatment of those victims.

Defendant asserts that the proposed testimony was relevant to the question whether he misled clients by holding himself out as a medical doctor. Respondent contends that because Briesach was not a stranger who saw an advertisement for Shiny Toes, his testimony would not have been relevant. Respondent does not specifically address defendant's argument that the probative value of Briesach's testimony was not substantially outweighed by its potential to cause undue prejudice, delay, or confusion of the issues.

According to defendant, Briesach's testimony "would have provided circumstantial evidence that appellant properly disclosed his licensure status to clients." He acknowledges that Briesach had a prior personal relationship with defendant and had gone to see defendant for pain management, rather than toenail fungus, but he claims these distinctions merely went to the weight of the evidence, not its admissibility.

We believe that the fact that Briesach had a prior personal relationship with defendant and was aware that he was a lawyer, not a medical doctor, significantly distinguishes his experience from the experiences of the named victims. Further, Briesach did not pay for his laser treatment; defendant provided it "as a friend." The trial court could reasonably determine that Briesach's testimony did not have any tendency to prove that defendant typically disclosed his lack of a medical license to the named victims, all of whom met defendant at Shiny Toes after seeing advertisements for the toenail fungus treatments, and all of whom paid for the services rendered. The trial court could also reasonably conclude that any probative value of such testimony would be substantially outweighed by the probability that its admission would confuse the issues. (See Evid. Code, § 352.)

20

Because we find no error in the trial court's ruling, we conclude there was no violation of defendant's fair trial or due process rights. "[T]he due process clause does not entirely strip a trial court of its power to exclude evidence on grounds of irrelevance or potential confusion, and the ruling[] here did not, in our view, offend due process. [Citation.]" (*People v. Roberts* (1992) 2 Cal.4th 271, 300-301.)

Moreover, even assuming that Briesach's testimony was relevant – i.e., that the differences between his experience and the experiences of the other clients went to the weight of his testimony, not its admissibility – and that it should not have been excluded pursuant to Evidence Code section 352, there was no prejudicial error.

Significantly, the jury convicted defendant of the charges relating to clients of the San Ramon and San Francisco offices, even though – as the prosecutor conceded at trial – there was no evidence that defendant had held himself out as a doctor to any of those victims. The jury obviously convicted defendant of those counts based on a finding that defendant either (1) advertised himself as a doctor, or (2) aided and abetted the diagnosis and/or treatment of a medical condition. In light of the verdicts on those counts, we disagree with defendant's claim that the jury "most likely" convicted defendant of the 10 San Jose counts based on the theory that defendant held himself out as a doctor. Likewise, defendant was convicted of the count involving Lynn New, one of the victims who obtained treatment in the San Jose office, despite the fact that New never met defendant. Thus, the record indicates that the jury found, beyond a reasonable doubt, that defendant's violations of the statute related to his advertisement, diagnosis, and/or treatment, and it is not reasonably probable that the jury would have reached a more favorable result had the trial court admitted Briesach's testimony. (See *People v. Watson* (1956) 46 Cal.2d 818, 836.) Any error was also harmless beyond a reasonable doubt. (See *Chapman v. California* (1967) 386 U.S. 18, 24.)

21

**B.**     *Supervision Fee Under Sections 1170, subdivision (h)(5)(B)(i), and 1203.1b*

Defendant contends the trial court erred by ordering him to pay a $110 per month "probation supervision fee . . . pursuant to section 1203.1[b] of the Penal Code." He points out that he was not placed on probation – rather, he was ordered to spend two years, eight months in custody, followed by two years of mandatory supervision under the 2011 Realignment Legislation.

Alternatively, defendant contends the supervision fee must be stricken because the trial court failed to comply with statutory procedures and because there is insufficient evidence that he has the ability to pay the monthly fee.

We agree the supervision fee was unauthorized.

### 1.     Background Regarding the Realignment Legislation

The 2011 Realignment Legislation (Stats. 2011, ch. 15, § 1), "together with subsequent related legislation, significantly changed the sentencing and supervision of persons convicted of felony offenses." (*People v. Cruz* (2012) 207 Cal.App.4th 664, 668, fn. omitted (*Cruz*).) The legislation "shifted responsibility for housing and supervising certain felons from the state to the individual counties. Thus, . . . once probation has been denied, felons who are eligible to be sentenced under realignment will serve their terms of imprisonment in local custody rather than state prison." (*Id.* at p. 671, fn. omitted; § 1170, subd. (h).)

A trial court sentencing a defendant to county jail under section 1170, subdivision (h) "has an alternative to a straight commitment to jail." (*Cruz*, *supra*, 207 Cal.App.4th at p. 671.) The court "can impose a hybrid sentence in which it suspends execution 'of a concluding portion of the term' and sets terms and conditions for mandatory supervision by the county probation officer. [Citation.]" (*Ibid.*) Specifically, section 1170, subdivision (h)(5)(B)(i) (hereafter section 1170(h)(5)(B)(i)) provides that the court may commit a defendant to county jail "[f]or a term as determined in

22

accordance with the applicable sentencing law, but suspend execution of a concluding portion of the term selected in the court's discretion, *during which time the defendant shall be supervised by the county probation officer in accordance with the terms, conditions, and procedures generally applicable to persons placed on probation*, for the remaining unserved portion of the sentence imposed by the court. The period of supervision shall be mandatory, and may not be earlier terminated except by court order." (Italics added.) This latter "portion of a defendant's sentenced term during which time he or she is supervised by the county probation officer" is now known as "mandatory supervision." (§ 1170, subd. (h)(5)(B)(ii).)

### 2. Whether a Fee for Supervision Costs May Be Imposed in Mandatory Supervision Cases

Defendant contends that the monthly probation supervision fee imposed by the trial court for his two-year period of mandatory supervision by the probation department is unauthorized and must be stricken.

The Attorney General contends that the supervision fee is authorized by sections 1170 and 1203.1b. The Attorney General argues that "[o]ne of the 'terms, conditions, and procedures generally applicable' to probationers" under section 1170 "is that they pay the reasonable cost of probation supervision" pursuant to section 1203.1b.

In reply, defendant asserts that section 1170 does not give a court the authority to impose supervision fees under section 1203.1b.

To determine whether the ordered fee for mandatory supervision is authorized, we are required to interpret the language of sections 1170(h)(5)(B)(i), and 1203.1b. " 'When construing a statute, we must "ascertain the intent of the Legislature so as to effectuate the purpose of the law." ' [Citations.] '[W]e begin with the words of a statute and give these words their ordinary meaning.' [Citation.] 'If the statutory language is clear and unambiguous, then we need go no further.' [Citation.] If, however, the language supports more than one reasonable construction, we may consider 'a variety of extrinsic

23

aids, including the ostensible objects to be achieved, the evils to be remedied, the legislative history, public policy, contemporaneous administrative construction, and the statutory scheme of which the statute is a part.' [Citation.] Using these extrinsic aids, we 'select the construction that comports most closely with the apparent intent of the Legislature, with a view to promoting rather than defeating the general purpose of the statute, and avoid an interpretation that would lead to absurd consequences.'" (*People v. Sinohui* (2002) 28 Cal.4th 205, 211-212.)

Regarding probation supervision costs, section 1203.1b provides that, "in any case in which a defendant is granted probation . . . , the probation officer . . . shall make a determination of the ability of the defendant to pay all or a portion of the reasonable cost of any probation supervision . . . ." (§ 1203.1b, subd. (a).) Further, "[t]he court shall order the defendant to pay the reasonable costs if it determines that the defendant has the ability to pay those costs based on the report of the probation officer . . . ." (*Id.*, subd. (b).) As we have stated, section 1170(h)(5)(B)(i) provides that when the defendant is under mandatory supervision, "the defendant *shall be supervised by the county probation officer in accordance with* the terms, conditions, and procedures generally applicable to persons placed on probation." (Italics added.) We believe that the language of section 1170(h)(5)(B)(i) clearly pertains to the *nature and manner of supervision by the probation officer over the defendant*—in other words, the nature and manner of the supervision itself—but that the language does not authorize the imposition of *supervision costs* under section 1203.1b to persons placed on mandatory supervision.

Our construction of section 1170(h)(5)(B)(i) is supported by several considerations.

First, probation supervision costs are considered collateral to a grant of probation, and therefore we are reluctant to construe broadly the language of section 1170(h)(5)(B)(i) as authorizing the imposition of supervision *costs* in mandatory supervision cases. Former sections 1203 and 1203.1 long authorized trial courts to

24

require the payment of certain items, such as fines and financial reparation and restitution, in proper cases as conditions of probation. (E.g., *People v. Lippner* (1933) 219 Cal. 395, 398; *In re McVeity* (1929) 98 Cal.App. 723, 726; *People v. Baker* (1974) 39 Cal.App.3d 550, 559.) Under this former statutory scheme, however, *People v. Baker, supra*, concluded that the trial court was *not* authorized to impose a probation condition requiring the defendant to pay for the costs of either his probation supervision or his prosecution. (*Id.* at pp. 559-560.) The appellate court observed that "[j]urisdictions that permit imposition of such costs generally do so under the explicit authority of statute" and concluded that "section 1203.1 explicitly authorizes the imposition of only limited fines as part of probation, which in turn should be oriented towards rehabilitation of the defendant and not toward the financing of the machinery of criminal justice." (*Id.* at p. 559.) After *People v. Baker,* "the Legislature enacted Penal Code section 1203.1b which permits the trial court to require a defendant to reimburse probation costs if the court determines, after hearing, that the defendant has the ability to pay all or a portion of such costs." (*People v. Bennett* (1987) 196 Cal.App.3d 1054, 1056, italics omitted (*Bennett*); *People v. Washington* (2002) 100 Cal.App.4th 590, 595.) Courts have subsequently held that the payment of probation costs under section 1203.1b may not be made a condition of probation because such costs are *collateral* to granting probation. (*Bennett*, *supra*, at pp. 1056-1057; *People v. Hart* (1998) 65 Cal.App.4th 902, 906-907; *Brown v. Superior Court* (2002) 101 Cal.App.4th 313, 321; *People v. Pacheco* (2010) 187 Cal.App.4th 1392, 1401, 1402 (*Pacheco*), disapproved on another ground in *McCullough*, *supra*, at p. 599.) In view of the collateral nature of probation supervision costs, we are reluctant to broadly construe the language in section 1170(h)(5)(B)(i), which concerns the *nature and manner of supervision* by the probation officer over the defendant in a mandatory supervision case, to include the authority of a court to impose the *costs* of mandatory supervision on a defendant.

Second, subsequent to the amendment that added the language at issue in section 1170, the Legislature amended two other Penal Code sections to expressly provide that a particular fine and a particular cost are applicable to mandatory supervision cases, even though similar amounts are already applicable to probation cases. In particular, although section 1202.44 already provides for the imposition of a suspended probation revocation restitution fine whenever probation is imposed, the Legislature amended section 1202.45 to require the imposition of a suspended "mandatory supervision revocation restitution fine" in every case where a person is subject to mandatory supervision under section 1170, subdivision (h)(5)(B). (§ 1202.45, subd. (b).) The Legislature also amended section 1203.9, which provides for the intercounty transfer of probation cases and the payment of costs for processing a transfer, to include mandatory supervision cases. (§ 1203.9, subds. (a) & (d).) These subsequent amendments by the Legislature to expressly provide for the payment of certain items by defendants in mandatory supervision cases, where those payments are already authorized in probation cases, suggest that the language in section 1170(h)(5)(B)(i) should not be broadly construed to include the authority of a court to impose the costs of mandatory supervision on a defendant under section 1203.1b. In view of these subsequent amendments, presumably the Legislature would have expressly provided that supervision costs under section 1203.1b must be borne by defendants in mandatory supervision cases if the Legislature had so intended. If the Legislature intends that supervision costs under section 1203.1b be borne by defendants in mandatory supervision cases, we respectfully suggest that the Legislature make that intent clear in the statutory language.

Lastly, a prior version of section 1170 provided that a defendant's sentence may include "a period of county jail time and a period of *mandatory probation* not to exceed the maximum possible sentence." (Stats. 2011, ch. 39, § 27, eff. June 30, 2011, operative Oct. 1, 2011 [italics added].) Before this prior version became operative, section 1170 was amended to delete the reference to "mandatory probation" and to include the

26

language now at issue concerning a concluding portion of the sentence where the defendant is "supervised by the county probation officer in accordance with the terms, conditions, and procedures generally applicable to persons placed on probation." (Stats. 2011-2012, 1st Ex.Sess., ch. 12, § 12, eff. Sept. 21, 2011, operative Oct. 1, 2011; Stats. 2011, ch. 361, § 6.7, eff. Sept. 29, 2011, operative Oct. 1, 2011.) The change in the reference to the latter portion of a defendant's sentence—from probation to supervision by a probation officer—suggests that the Legislature did not intend probation and mandatory supervision to be interchangeable or otherwise identical in all respects.

Based on the foregoing considerations, and the language of sections 1170(h)(5)(B)(i) and 1203.1b, we conclude that the ordered monthly supervision fee of $110 is not authorized. We will order the fee stricken. In view of our conclusion, we do not reach defendant's contention that there is insufficient evidence to support a finding of his ability to pay the fee or his contention that the trial court failed to follow proper procedures in imposing the fee.

### C. Booking Fee

Defendant challenges the $259.50 criminal justice administration fee imposed at sentencing, claiming trial counsel was ineffective for failing to object to its imposition. According to defendant, effective counsel would have objected on the basis that there was insufficient evidence of defendant's ability to pay the fee.

#### 1. Proceedings Below

At sentencing, the trial court imposed "a general order of restitution to all victims" but made specific restitution orders of between $395 and $1,235 for each victim, for a total of $10,125. The trial court also imposed a $10,000 restitution fine pursuant to Penal Code section 1202.4, subdivision (b)(2), and it imposed but suspended an additional $10,000 fine pursuant to Penal Code section 1202.45. It further ordered defendant to pay a $720 court security fee pursuant to Penal Code section 1465.8, a $570 criminal conviction assessment pursuant to Government Code section 70373, and "[a] $259.50

27

criminal justice administration fee to the County of Santa Clara . . . pursuant to Government Code section[s] 29550, 29550.1, and 29550.2."

Following the announcement of these fines and fees, the trial court stated, "I believe that the defendant will be able to pay these fees once he gets out of custody based upon his obvious intelligence and his ability to be gainfully employed." The trial court added, "I do think attorney's fees are appropriate."

Defendant objected "to the award of attorney's fees based on inability to pay" and "14th Amendment due process considerations" The trial court responded, "Well, I don't really think there is a 14th Amendment issue here, but because of the amount of restitution and restitution fines, I will not order attorney's fees."

### 2. Analysis

The California Supreme Court in *People v. McCullough* (2013) 56 Cal.4th 589 (*McCullough*) held that a defendant who fails to challenge the sufficiency of the evidence when the trial court imposes the criminal justice administration fee forfeits the right to challenge the fee on appeal. Defendant claims that by failing to object when the trial court imposed the criminal justice administration fee, trial counsel rendered ineffective assistance of counsel.

"In order to establish a claim of ineffective assistance of counsel, defendant bears the burden of demonstrating, first, that counsel's performance was deficient because it 'fell below an objective standard of reasonableness [¶] . . . under prevailing professional norms.' [Citations.] Unless a defendant establishes the contrary, we shall presume that 'counsel's performance fell within the wide range of professional competence and that counsel's actions and inactions can be explained as a matter of sound trial strategy.' [Citation.] If the record 'sheds no light on why counsel acted or failed to act in the manner challenged,' an appellate claim of ineffective assistance of counsel must be rejected 'unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation.' [Citations.] If a defendant meets the

28

burden of establishing that counsel's performance was deficient, he or she also must show that counsel's deficiencies resulted in prejudice . . . ." (*People v. Ledesma* (2006) 39 Cal.4th 641, 745-746; see *Strickland v. Washington* (1984) 466 U.S. 668, 687-688, 694.)

Government Code sections 29550, 29550.1, and 29550.2 authorize the imposition of a criminal justice administration fee on an arrestee who is ultimately convicted in order to cover the expenses involved in booking or otherwise processing the arrestee in a county jail.  Government Code sections 29550 and 29550.2 include provisions expressly requiring a finding that the person has the ability to pay the fee (*id.*, §§ 29550, subd. (d)(2), 29550.2, subd. (a)), whereas Government Code section 29550.1 does not contain such an express requirement.  The applicability of these sections depends on which governmental entity arrested the defendant.  (*McCullough*, *supra*, 56 Cal.4th at p. 592; *Pacheco, supra,* 187 Cal.App.4th at p. 1399, fn. 6.)  According to defendant, the record in this case reflects that he was arrested by the Medical Board and therefore Government Code section 29550.2 applies in this case.  That section provides that "[i]f the person has the ability to pay, a judgment of conviction shall contain an order for payment of" the booking fee.  (Gov. Code, § 29550.2, subd. (a).)  We will assume, without deciding, that the trial court was required to make an ability-to-pay finding in this case before imposing the fee.  (See *Pacheco*, *supra*, at pp. 1399-1400 [Government Code sections 29550 and 29550.2 both require an ability-to-pay finding]; but see *McCullough*, *supra*, at p. 592 [the "factors a court considers in determining whether to order the fee payment . . . vary depending on whether or not the court sentences the defendant to probation or prison"].)

An ability-to-pay finding may be express or implied, but it must be supported by substantial evidence.  (*Pacheco*, *supra,* 187 Cal.App.4th at p. 1400.)  "Ability to pay does not necessarily require existing employment or cash on hand." (*People v. Staley* (1992) 10 Cal.App.4th 782, 785.)  The trial court may consider the defendant's ability to pay in

29

the future, including the defendant's ability to obtain wages in prison. (*People v. Hennessey* (1995) 37 Cal.App.4th 1830, 1837; *People v. Gentry* (1994) 28 Cal.App.4th 1374, 1376-1377; *People v. Frye* (1994) 21 Cal.App.4th 1483, 1487.)

In this case, the trial court made an explicit finding that defendant had the future ability to pay all of the fines and fees "based upon his obvious intelligence and his ability to be gainfully employed." The record supports this finding. Defendant had previously been an attorney and had run a number of businesses. He had already put $2,050 into a fund for the victim restitution. In light of the trial court's express finding of defendant's ability to pay and the evidence in the record, trial counsel appears to have made a reasonable tactical decision to object only to the attorney's fees. Moreover, we can discern no prejudice from trial counsel's failure to object. The trial court's comments about defendant made it clear it would not have stricken the administration of justice fee, which was relatively small in comparison to the victim restitution and restitution fines, based on an inability-to-pay objection. Thus, defendant fails to establish ineffective assistance of counsel.

## DISPOSITION

The judgment is ordered modified by striking the monthly supervision fee of $110. As so modified, the judgment is affirmed.

_____

BAMATTRE-MANOUKIAN, ACTING P.J.

WE CONCUR:

_____

MÁRQUEZ, J.

_____

GROVER, J.

31